IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN EMERINE, | : | Case No. 4:19-cv-1448 |
| | : | |
| Petitioner, | : | OPINON & ORDER |
| | : | [Resolving Doc. 1] |
| v. | : | |
| | : | |
| BRIGHAM SLOAN, WARDEN, | : | |
| | : | |
| Respondent. | : | |
| | : | |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

In this habeas case, Petitioner Jonathan Emerine challenges his Ohio jury-trial conviction of rape and gross sexual imposition.[1]  Finding that Emerine's claims do not succeed, the Court **DENIES** the petition for writ of habeas corpus.  Further, the Court **DECLINES** to grant a certificate of appealability.

I.    Background

A.  Conviction

On March 31, 2016, an Ohio jury found Emerine guilty of rape and three counts of gross sexual imposition.  The case involved two young female victims—S.M. and K.M.—who are both Emerine's nieces.  The Ohio appellate court that decided Emerine's direct appeal recounted the following facts:

---

[1] Warden Sloan did not file the state court record under this case number.  However, the Court takes judicial notice of the previously filed state court record in Emerine's earlier petition in this Court.  State Court Record, *Emerine v. Sloan*, No. 18-cv-02079 (N.D. Ohio Nov. 16, 2018), ECF No. 5-1 [hereinafter "State R."].

This case involves two young female victims, 11-year-old S.M. and 13-year-old K.M. Regarding S.M., on April 2, 2015, she spent the night with her aunt, Cassie Emerine ("Cassie"). Cassie lived at her Howland Township home with [Emerine] (Cassie's husband and S.M.'s uncle) and her infant son. Cassie and S.M. had a very close relationship. They had lived together for several years and had regular sleepovers in subsequent years. On the night at issue, around midnight, S.M. was awake on the couch. She was wearing a bra, panties, and a long t-shirt. [Emerine] entered the room and asked S.M. if she wanted to watch a T.V. show on his cell phone. The others in the home were asleep.

[Emerine] and S.M. laid on the couch together. [Emerine] then asked S.M. to go with him to the basement to help him do laundry. In the basement, [Emerine] began tickling S.M. on her breasts over her t-shirt. S.M. indicated [Emerine] sort of pushed her/sat her down on a pile of laundry, straddled over her, and continued tickling her. S.M. was "uncomfortable." She tried to get up from underneath him but she was not successful. She asked [Emerine] to stop several times and he finally did.

[Emerine] and S.M. went back upstairs. They laid on the couch together to finish watching the show on [Emerine]'s cell phone. [Emerine] began touching S.M., skin to skin, on her breast with one hand and her vaginal area with the other. S.M. testified that [Emerine] initially rubbed her vaginal area with his hand before getting rougher. [Emerine] ended up grabbing S.M.'s breast and pushing his finger into her vagina. She told him to stop because it hurt. However, [Emerine] continued rubbing her breast and vaginal area for a while. He told S.M. that when Cassie leaves for work in the morning, they could go into the bedroom together.

S.M. was scared. She immediately messaged her mother, Bridget Coleman, to come pick her up. While getting dressed and waiting for her mom, S.M. said that [Emerine] continued to bother her. He pushed her knees up to her shoulders and pinned her down on her back. He asked her why she was getting dressed and why she was leaving. When Bridget arrived, S.M. left. At that time, S.M. was afraid to tell her mother what [Emerine] had done to her for fear that it would break up the family. S.M. did not tell anyone until three months later when asked by her mother if [Emerine] had touched her, after learning that [Emerine] had touched S.M.'s cousin, K.M.

A criminal investigation began on July 3, 2015. At the HTPD, S.M. told the same version of events of what had taken place to Sergeant Carr. Detective Villanueva and Sergeant Carr spoke about the incident. S.M. was also interviewed about a week later by Investigator Wocjiak as part of a medical and emotional examination. S.M. also gave the same account of what had

- 2 -

happened to Wocjiak. S.M. provided very good detail and created a timeline that described how the incident progressed through the night.

Nurse Practioner Gorsuch conducted a physical examination of S.M. The tests for pregnancy and sexually transmitted disease were negative. The exam of S.M.'s vaginal area and hymen were normal. Gorsuch testified that little girls' hymens are tender to the touch and are covered by the labia majora to protect them from any contact by outside objects including underwear or clothing. Gorsuch indicated that nothing would touch the hymen and cause pain unless it is purposefully touched. Gorsuch recommended S.M. receive trauma-focused cognitive behavioral counseling.

Dr. Melville testified that a normal medical examination is present in at least half of all child sexual assault cases even those resulting in pregnancy. Dr. Melville stated the vagina heals very quickly without a scar or other sign of injury. In this case, over three months had passed between the incident and the medical exam. Dr. Melville further indicated that a girl of S.M.'s age would not have pain upon touching her vaginal area unless her hymen had been touched and penetration had occurred.

Regarding K.M., on June 26, 2015, she was babysitting her one-year-old cousin at Cassie's and [Emerine]'s home in Howland Township. Like S.M., Cassie is K.M.'s aunt and [Emerine] is K.M.'s uncle. K.M. watched the baby from 8:00 a.m. when Cassie left for work until [Emerine] came home sometime in the afternoon. [Emerine] sat by K.M. on the couch and asked her what kind of bra she was wearing. K.M. responded that she had on a sports bra. [Emerine] reached over, pushed his hand through the side of her tank top and bra, and began touching K.M.'s breast, skin to skin. [Emerine] pulled his hand out, reached back in, and began grabbing K.M.'s breast, skin to skin.

K.M. managed to pull away. She scooted over to the other side of the couch. [Emerine] followed and scooted over next to her. K.M. slid down off the couch to sit on the floor instead. [Emerine] followed, slid off the couch, and sat next to her on the floor. K.M. covered herself up with her arms. She was scared that [Emerine] might try to touch her again. [Emerine] grabbed K.M.'s arms with one hand and held them to her chest. This forced K.M. to slide down. She was lying on her back with her arms pinned down to her chest. [Emerine] was on his knees behind K.M. pinning her to the floor with one hand.

According to K.M., [Emerine] then used his other hand to pull up the front of the waistband of her leggings. He looked down her pants at her pubic area. K.M. managed to get one hand free and tried covering up her pubic area.

- 3 -

[Emerine] asked her if she shaved down there. K.M. asked [Emerine] to stop at least once or twice. However, [Emerine] continued to try pulling her hand away from her pubic area while still pinning her to the floor. [Emerine] leaned down close to K.M. She bit his arm, grabbed her phone, and locked herself in the bathroom.

K.M. immediately texted her mother, Amanda Coleman, to come pick her up. K.M. then texted her mother again regarding what had happened. During trial, K.M.'s text messages to her mother were entered into evidence, detailing the incident. Amanda waited several days before reporting the incident to the police. Amanda ended up taking K.M. to the HTPD on July 2, 2015. K.M. provided the same account of how [Emerine] sexually assaulted her to Sergeant Carr.

Following the state's case, [Emerine] did not testify. Defense counsel, on cross-examination, called RoyAnne Rudolph, an investigator with the Trumbull County Prosecutor's Office. Rudolph first met with S.M. on August 20, 2015. Rudolph testified she showed S.M. a "display," i.e., the nomenclature of a female's anatomy for the purposes of identification. Regarding the "hole" in reference to where [Emerine] had inserted his finger, S.M. pointed to the picture of a vagina. Rudolph said there is a written communication of S.M.'s interview.[2]

The trial court sentenced Emerine to 31-and-one-half years to life in prison.[3]  The

Eleventh District Court of Appeals affirmed the conviction.[4]  The Ohio Supreme Court

subsequently declined jurisdiction.[5]  After that, Emerine unsuccessfully sought state post-

conviction relief.[6]

### B.  Federal Habeas Petition

Emerine raises six grounds for relief in his petition:

Ground One:  Trial Court failed to provide jury instructions on lesser included offenses.

Ground Two:  The convictions are against the manifest weight of the evidence, thereby the evidence was insufficient to support guilty verdict.

---

[2] State R. at 58–62.
[3] *Id.* at 10.
[4] *Id.* at 58.
[5] *Id.* at 108.
[6] *Id.* at 109–324.

Ground Three:  Ineffective Assistance of Appellate Counsel

Ground Four:  Ineffective assistance of Trial counsel

Ground Five:  Emerine was deprived of the effective assistance of counsel, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution where Trial Counsel abrogated Emerine's right to testify in his own defense.

Ground Six:  Misconduct of a witness and a juror deprived Emerine of a fair trial by an impartial jury and violated Emerine's Constitutional Right to Due Process of Law.[7]

In a well-reasoned Report and Recommendation ("R&R"), Magistrate Judge Thomas M. Parker recommended that this Court find Petitioner Emerine not entitled to federal habeas corpus relief on any of those grounds.[8]  Petitioner Emerine filed *pro se* objections.[9] The Warden did not respond.

This Court reviews *de novo* the objected-to portions of a R&R.[10]

## II.  Discussion

A state prisoner seeking a writ of habeas corpus has the ultimate burden to prove that he is "in custody in violation of the Constitution or laws or treaties of the United States."[11]   Additionally, the petitioner has the burden to show that any claim he presents meets all the jurisdictional and procedural requirements required to obtain merits review by the federal habeas court.[12]

---

[7] Doc. 7 at 20; *see also id.* at n.4 (noting that Emerine did not file additional "memorandum in support" specific to Grounds Five and Six).
[8] Doc. 7.
[9] Doc. 9.
[10] 28 U.S.C. § 636(b)(1).
[11] 28 U.S.C. § 2254(a).
[12] *See, e.g.,* 28 U.S.C. § 2254(b) (exhaustion); 28 U.S.C. § 2244(d) (statute of limitations).

The Court considers Emerine's *pro se* objections using a less stringent standard.[13] Emerine filed a counsel-assisted petition but now proceeds without counsel.

### A. Ground One: Lesser-Included-Offense Instructions

Emerine's claim that the trial court erred in denying his request for lesser-included instructions deals with a state-law question and is non-cognizable on habeas review.  State criminal procedure law controls whether lesser-included instructions should be given. Habeas relief comes only when federal constitutional or statutory rights are violated. Federal courts give habeas relief for state trial jury instruction claims in only "rare" circumstances where "a fundamental miscarriage of justice is found to have resulted from the arbitrary and unsupportable denial of a lesser included offense instruction in clear defiance of state law."[14]

While Emerine argues to the contrary in his objections, his claim does not fall into that category of rare non-capital cases.   As discussed below, there was sufficient evidence to find him guilty of the charged crimes, meaning that he has no plausible claim that his requested instruction was denied in defiance of Ohio law.[15]  While Emerine references certain trial testimony in support of his argument, he does not address the considerable other evidence that reasonably allowed the jury to find him guilty.

### B. Ground Two: Manifest Weight and Sufficiency of the Evidence

---

[13] *Boag v. MacDougall,* 454 U.S. 364, 365 (1982) (per curiam) (citing *Haines v. Kerner,* 404 U.S. 519 (1972)); *see also Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) (*pro se* complaints entitled to liberal construction).

[14] *Elatrache v. Jackson*, No. 20-1881, 2020 WL 8816473, at *2 (6th Cir. Dec. 23, 2020) (quoting *Bagby v. Sowders*, 894 F.2d 792, 795–97 (6th Cir. 1990) (en banc)).

[15] *Cf. State v. Thomas*, 533 N.E.2d 286 (Ohio 1988), paragraph two of the syllabus (Ohio law requires lesser-included instruction "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense.").

Emerine's claim that his conviction was against the manifest weight and sufficiency of the evidence fails.

The manifest weight of the evidence argument deals with an Ohio law question and is non-cognizable on federal habeas review.[16]

Emerine did not bring a sufficiency-of-the-evidence claim in his direct appeal.[17] Because Emerine did not raise the claim in his counsel-assisted direct appeal and offers no grounds to show cause and prejudice, the sufficiency-of-the-evidence claim is procedurally defaulted.[18]

In addition, the sufficiency claim would fail on the merits.  When a criminal defendant alleges that the evidence at trial was insufficient to support his conviction on habeas review, the court must determine whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[19]

Regarding the conviction for the rape of S.M., Emerine objects that "the victim's testimony demonstrated that penetration had not occurred."[20]  He seems to reference a particular section of the victim's testimony on cross examination in which victim S.M. recounts that a Child Service official asked if Emerine "was near the hole down there in your private area, but you didn't know if he went in?," and S.M. responded "yes."[21] However, Emerine ignores the next page of the transcript in which S.M. suggests that

---

[16] *See, e.g., Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (6th Cir. 2007).
[17] State R. at 69 (¶ 47) (raising only "manifest weight of the evidence" claim).
[18] *See, e.g., Gerth v. Warden, Allen Oakwood Corr. Inst.,* 938 F.3d 821, 830 (6th Cir. 2019).
[19] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).
[20] Doc. 9 at 12.
[21] Transcript of Jury Trial, *Emerine v. Sloan*, No. 18-cv-02079 (N.D. Ohio Nov. 16, 2018), ECF No. 5-2 at 338–39.

Emerine did penetrate her.[22]  S.M. also testified that: "he kind of like -- like went in.  And like I told him to stop because it hurted."[23]  S.M.'s account of what happened was corroborated by others, as well.[24]

Regarding Emerine's conviction for gross sexual imposition against K.M., Emerine says that there was not sufficient evidence that he used force against her.[25]  But, K.M.'s testimony provided sufficient basis for the jury to find that Emerine used force.  As Judge Parker summarized succinctly:

> K.M. testified at trial that: (1) she was born on July 29, 2001; (2) Emerine was her uncle and had rule-making authority over her while she was at his house; (3) Emerine pushed his hand under her clothes and grabbed her breasts, skin-to-skin; (4) she pulled away, slid to the other side of the couch, and was afraid Emerine would continue grabbing her breasts or do more; (5) Emerine followed her to the other side of the couch, eventually pinned her down, lifted up the front of her leggings, and tried to grab her underwear; (6) Emerine continued this conduct, despite K.M. asking him to stop, until she bit him, got free, and locked herself in the bathroom.[26]

### C.  Ground Three: Ineffective Assistance of Appellate Counsel

Emerine's argument that his appellate counsel was constitutionally ineffective for not arguing that the prosecution withheld impeachment evidence does not succeed.[27]

Since the Ohio appellate court addressed this claim on the merits, this Court's sole inquiry is "whether the state court's application of the *Strickland* standard was unreasonable."[28]

---

[22] *Id.* at 339 ("She didn't, like, tell me what it was, but she asked me if like -- like he -- because I said I didn't know if he did go in. But she said that, like, if -- like, did it go where you pee? And I said yes. Like the hole down there, she showed me. So yes, I do think he touched me down there."

[23] *Id.* at 316.

[24] Doc. 7 at 31 ("[T]estimony from Sergeant Carr, Nurse Gorsuch, Dr. Melville, Wocjiak, and Rudolph corroborated S.M.'s testimony.").

[25] Doc. 9 at 16.

[26] Doc. 7 at 32.

[27] Doc. 7 at 37.

[28] *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

The Ohio Court of Appeal's application of *Strickland* was not unreasonable.[29]  That court found that Emerine's claim failed to make the threshold showing that he was deprived of effective representation.[30]  The court also found that the trial court did not make an Ohio law error in determining that materials at issue were privilege protected.[31]  And on the *Brady* argument, the court determined that the materials were neither exculpatory nor impeaching.[32]  The court additionally said Emerine was not prejudiced as he was able to cross-examine the victim with respect to what the victim told investigators.[33]

### D.  Grounds Four and Five: Ineffective Assistance of Trial Counsel

Emerine procedurally defaulted his ineffective assistance of trial counsel claims and does not show cause and prejudice to excuse the default.[34]  In Ground Four, Emerine says that his counsel was defective for failing to call Irene Walker and Casandra Emerine as witnesses.  In Ground Five, he says that trial counsel improperly abrogated Emerine's right to testify in his own defense without informing him that only he could waive the right to testify.

In his objections, Emerine responds that *res judicata* does not apply since his claims "could not have been resolved using evidence from within the record."[35]  Here, he seems to renew his earlier made argument that the procedural default should be excused.

 Judge Parker carefully addressed this argument and this Court agrees with that reasoning.[36]  First, Judge Parker correctly concluded that this Court is bound by the Ohio

---

[29] State R. at 128–31.
[30] *Id.* at 130.
[31] *Id.*
[32] *Id.*
[33] *Id.* at 131.
[34] Doc. 7 at 196.
[35] Doc. 9 at 21.
[36] Doc. 7 at 41 n.5.

court's earlier determination that, as a matter of Ohio law, *res judicata* barred the claims.[37]

And second, Judge Parker observed that the Ohio appellate court was correct in

determining that Emerine could have brought his ineffective assistance of trial counsel

claims in his direct appeal based on the trial record.[38]

### E.  Ground Six: Jurors' Nondisclosure of Bias[39]

Emerine's claim that juror bias deprived him of his Due Process right to a fair trial

fails.[40]  Emerine cites to an affidavit signed by his father-in-law that says that the mother of

one of the victims went to school with one juror and worked with another juror.[41]

This Court resolves the claim on the merits.[42]  Assuming for the sake of argument

that the affidavit is credible, it does not allege a constitutional violation.  To make out such

a claim, Emerine must show that a juror was partial.[43]  However, being acquainted with

someone involved in a case does not show juror partiality.[44]  Further, Emerine does not

allege that the two jurors at issue concealed their relationship with one victim's mother.[45]

### III.  Conclusion

---

[37] *Id.*

[38] *Id.*

[39] Although Emerine calls his claim a "juror and witness misconduct" claim, the substance of his claim indicates that it is better characterized as a "jurors' nondisclosure of bias" claim.

[40] Doc. 7 at 47.

[41] State R. at 172.

[42] *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (allowing courts to reach "easily resolvable" merits questions before complicated state procedural-bar issues).

[43] *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001)

[44] *McQueen v. Scroggy*, 99 F.3d 1302, 1320 (6th Cir. 1996) (*overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004) ("There is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case.").

[45] *Cf. Eng. v. Berghuis*, 900 F.3d 804, 813 (6th Cir. 2018).

The Court **DISMISSES** all claims and **DENIES** the petition for writ of habeas corpus.

Finding not debatable that habeas relief is not available for any claims raised in the

petition, the Court **DECLINES** to issue a certificate of appealability.[46]

Dated: February 3, 2022

s/      *James S. Gwin*

JAMES S. GWIN

UNITED STATES DISTRICT JUDGE

---

[46] *Cf. Cunningham v. Shoop,* 817 F. App'x 223, 225 (6th Cir. 2020).